

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 4, 2024

**By ECF and Email**
Hon. Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

    Re:    *United States v. Edwin Cordero*, 23 Cr. 56 (RA)

Dear Judge Abrams:

    The Government respectfully submits this letter in advance of sentencing in this matter, scheduled for June 18, 2024, at 2:00 p.m., relating to the defendant's violations of his conditions of supervised release. For the reasons provided below, the Government submits that the Court should impose a sentence of 24 months' imprisonment, which is the statutory maximum sentence and within the Guidelines sentencing range.

    **I.**    **The Defendant's Underlying Case**

    On February 18, 2021, the defendant pleaded guilty in Case No. 21 Cr. 153 (KM) (D.N.J.) to one count of wire fraud, in violation of 18 U.S.C. § 1343. According to the defendant's Pre-Sentence Investigation Report ("PSR"), the defendant, together with co-conspirators, engaged in a fraudulent scheme to open bank accounts and access funds that had been fraudulently deposited into those accounts. (PSR ¶ 45.) Specifically, the defendant opened at least three bank accounts as part of the charged scheme, and, together with co-conspirators, facilitated the fraudulent transfer of funds into those accounts, including through the deposit of a forged check in the amount of $51,231.11, and through an unauthorized wire transfer in the amount of $138,274.32, for a total loss amount of $189.505.43 attributable to the defendant. (PSR ¶¶ 132-149.)

    At the time of sentencing in Case No. 21 Cr. 153 (KM) (D.N.J.), the defendant had four criminal history points, including three criminal history points from a 2004 conviction for attempted robbery in the second degree, in violation of New York Penal Law §§ 160.10, 110.00, for which the defendant was sentenced to four years' imprisonment.[1] (*See* PSR ¶ 184.) At offense level 14 and criminal history category III, the defendant's Guidelines range was 21 to 27 months' imprisonment. (PSR ¶ 216; Transcript of June 23, 2021 Sentencing ("2021 Sent. Tr.") at 7.)

---

[1] The PSR describes the 2004 conviction as being for "robbery." The specific robbery-related offense, *i.e.*, attempted robbery in the second degree, is based on criminal history information found in law enforcement records, which were produced to the defense in this case.

June 4, 2024
Page 2

At sentencing, the Honorable Kevin McNulty imposed a below-Guidelines sentence of 18 months' imprisonment, to be followed by a three-year term of supervised release, and restitution in the amount of $148,120.84, calculated as the loss amount referenced above less the amount in the accounts that the victim banks were able to freeze before the defendant and his co-conspirators could access the funds. (*See id.* at 7-8.) Judge McNulty noted that he would have imposed a higher sentence, but for the fact that the defendant was a youth when he committed the robbery that principally drove his criminal history score, and the defendant's criminal history was limited in subsequent years. (*See, e.g., id.* at 22 (The Court: "Of course, if I had seen criminal activity escalating in that time, that would be very different.").)

**II.    The Defendant's Supervised Release and Instant Violations**

On or about December 28, 2022, the defendant commenced his term of supervised release in the Southern District of New York, based on his residence in the Bronx, New York. (*See* Dkt. 3.) On or about February 1, 2023, jurisdiction over the defendant's supervised release was transferred from the District of New Jersey to the Southern District of New York, pursuant to 18 U.S.C. § 3605. (Dkt. 1.)

In April 2023, the defendant was offered an opportunity to participate in the RISE Court, an employment reentry court program overseen by the Honorable Alison J. Nathan. (May 14, 2024 Amended Violation Report ("Amended VOSR Report") at 2.) According to the Amended VOSR Report, the defendant, in fact, participated in the RISE Court program; however, "he maintained marginal compliance as he held an off-the books job at a print shop" and was later "let go from his position at the print shop . . . due to poor attendance/performance." (*Id.* at 3.) In addition, on November 12, 2023, the defendant was arrested for assaulting an individual who was attempting to intervene in an altercation between the defendant and his wife, after hearing the defendant's wife "yelling for him to stop hitting her." (*Id.*) According to the NYPD Police Report (as summarized in the Amended VOSR Report), the defendant punched the victim in the face multiple times, resulting in the victim suffering facial injuries and being transported to the hospital. (*Id.*) The case was dismissed because the victim ultimately decided not to cooperate with law enforcement; however, the arrest was reported to Judge Nathan, and the defendant was referred to anger management treatment as part of his participation in the RISE Court. (*Id.*)

Only three months later, on or about February 19, 2024, the defendant committed the assault giving rise to the instant violations. Specifically, at approximately 7:32 p.m., the defendant was walking home from a deli near his apartment in the Bronx, when a small child, who was playing across the street with his friend, threw a snowball at the defendant. (*See, e.g.*, GX 3-2A, GX 5-3; Transcript of May 15, 2024 Hearing ("Hr'g Tr.") at 44.) In response, the defendant, who was 36 years old, stopped and confronted the children; the smaller child ran away seconds before the defendant crossed the street. (*See, e.g.*, GX 3-2A, GX 5-3; Tr. at 74-76.) The defendant proceeded to slash the remaining child, J.C., a 17-year-old with autism, with an unknown object, resulting in a large gash on the left side of J.C.'s face that required treatment at a hospital. (*See, e.g.*, GX 2, 3-2A; GX 5-3, GX 5-4.) As the defendant walked away, he yelled back at J.C.: "Suck my dick, nigga. Remember mines, nigga." (GX 5-5; Tr. at 79.) The defendant also shouted, "I keep a rachet on me, pussy," an apparent escalatory threat referencing the defendant's possession

2

June 4, 2024
Page 3

of a gun. (GX 5-5; Tr. at 80.)  The defendant then placed the unknown object in his jacket pocket and walked back to his apartment.  (*See* GX 5-7, 5-7A; Tr. at 89-91; *see* GX 5-8 through GX 5-11.)

On or about February 28, 2024, the defendant was arrested by a New York City Police Department ("NYPD") detective at the 52nd Precinct Stationhouse for assaulting J.C.  The next day, the U.S. Probation Office ("Probation") submitted a violation report, which, as amended on May 14, 2024 (solely with respect to the statutory subsection referenced in Specification No. 3), set forth the following specifications, corresponding to the state charges at the time of arrest:

1. On or about February 19, 2024, the defendant committed the state crime of assault in the second degree, to wit, assault with intent to cause physical injury with a deadly weapon or dangerous instrument, in violation New York Penal Law § 120.05(2).

2. On or about February 19, 2024, the defendant committed the state crime of assault in the third degree, to wit, assault with intent to cause physical injury, in violation New York Penal Law § 120.00(1).

3. On or about February 19, 2024, the defendant committed the state crime of criminal possession of a weapon in the fourth degree, in violation of New York Penal Law § 265.01(2).

4. On or about February 19, 2024, the defendant committed the state crime of harassment in the second degree, in violation of New York Penal Law § 240.26.

5. On or about February 19, 2024, the defendant committed the state crime of assault in the first degree, in violation New York Penal Law § 120.10.

6. On or about February 19, 2024, the defendant committed the state crime of endangering the welfare of an incompetent person, in violation of New York Penal Law § 260.05.

Amended VOSR Report at 3-4; *see also* Feb. 29, 2024 Violation Report ("VOSR Report") at 3-4.

Later on February 29, 2024, in response to a petition from Probation, this Court issued an arrest warrant in connection with the specifications.  The defendant was detained in state custody pursuant to a federal detainer based on that warrant, transferred into federal custody on March 18, 2024, and presented before the Honorable Gary Stein on that same date, and ordered detained pending a hearing on the specifications.  (*See* Dkt. 5.)  On April 3, 2024, the defendant was arraigned before this Court on the specifications set forth in the VOSR Report.  On May 14, 2024, Probation filed the Amended VOSR Report, which corrected the applicable statutory subsection referenced in Specification No. 3, as noted above.  On May 15, 2024, this Court arraigned the defendant on the specifications set forth in the Amended VOSR Report; the Government indicated

3

June 4, 2024
Page 4

that it was not proceeding as to Specification No. 6; and this Court held an evidentiary hearing on the remaining specifications.[2]

On May 29, 2024, this Court issued an order finding that the Government had proven Specification Nos. 1 through 5, and scheduled sentencing for June 18, 2024. (Dkt. 15.)

### III.   Jail Calls

While the defendant was detained in state custody following his arrest, and in federal custody following his presentment, the defendant made numerous recorded jail calls, which the Government collected and reviewed in preparation for the May 15, 2024 violation hearing. The Government introduced into evidence excerpts of four of those calls at the hearing. (*See* GX 7-1 through GX 7-4, GX 7-1T through 7-4T; GX S3; Hr'g Tr. at 118-120.)

In addition to the recorded call excerpts introduced at the hearing, the defendant made various calls that bear on sentencing factors such as the defendant's history and characteristics, including the defendant's history of domestic violence, use of threatening language—including to the mother of the defendant's children, and to the Probation Officer—and the defendant's disregard for court-ordered conditions of supervised release. As illustrative examples of such calls, the Governments attaches Exhibits A through D, which are summarized in relevant part below:

- **Exhibit A (March 3, 2024 Call),**[3] **at 2:00 – 2:22.** After the call recipient tells the defendant, in substance, that she is going to put the defendant's daughter on the phone and tells the defendant not to call her anymore after that, the defendant responds: "Yo word to my mother, you a dead bitch. I don't give a fuck if you tell the police or not nigga. You could suck my dick hoe. Gangsta."

- **Exhibit B (March 4, 2024 Call), at 4:30 – 5:24.** The defendant, referencing another woman, states, "I didn't kick her, I pushed her with my feet." When asked by the call recipient why the defendant kicked the other woman, the defendant says, "because she was talking mad shit, it was annoying me." The defendant later minimizes his domestic violence, stating, "I'm not the type of nigga who be beating up bitches like on some domestic violence shit, like I might smack the bitch you know what I'm saying, but I'm not gonna sit there and beat you like a nigga."

---

[2] On March 20, 2024, a grand jury in Bronx County returned an indictment (the "Indictment") against the defendant, which also did not charge the crime alleged in Specification No. 6, among certain other differences from the charges on which the defendant was initially arrested in the state. (*See* Dkt. 14 at 2 (summarizing changes).) The Indictment continued to charge the defendant with assault in the first, second, and third degree, and criminal possession of a weapon in the fourth degree. (*See id.*)

[3] Exhibit A is the full recording of the jail call that was previously excerpted at GX 7-3.

- **Exhibit C (March 4, 2024 Call), at 4:50 – 6:13.**  The defendant states:  "When I come home I'm on bullshit, I'm doing whatever I want.  They can suck my dick.  Ya'll niggas goin' to have to just keep on violating me.  I'm gonna do whatever I want, nigga.  Straight up.  I'm going outta town, I'm doing everything I want to do."  When the call recipient reminds the defendant that he shouldn't talk that way on the phone, the defendant responds: "Man they can suck my dick, the PO [*i.e.,* the Probation Officer], 'fuck out here, don't give a fuck about them niggas, what the fuck they gonna do, nigga?  You can't keep me for life for wire fraud, nigga, fuck you.  I ain't kill nobody, nigga I took money out the bank, suck my dick."  When the call recipient reminds the defendant that he's currently incarcerated for something other than wire fraud, the defendant says:  "I don't give a fuck nigga, I ain't gonna get life either way, nigga, so they can suck my dick, like I said.  Get the fuck outta here."  The defendant later adds that he will travel out of town upon his release, regardless of whether he has permission to do so, stating, "I don't care."

- **Exhibit D (March 11, 2024 Call), at 5:06 – 5:16.**  The defendant, referencing his Probation Officer, states, "When I go to my fed court, I'm gonna violate that bitch.  . . .  I don't give a fuck, what you gonna do you?  You can't give me life for a violation, nigga, so suck my dick, bitch."[4]

IV.   **Applicable Law**

The Court may revoke a term of supervised release upon a finding by a preponderance of the evidence that the defendant violated a condition of supervised release.  18 U.S.C. § 3583(e)(3).  When imposing a sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need to protect the public from further crimes of the defendant, and the applicable Guidelines range.  *See* 18 U.S.C. §§ 3553(a), 3583(e)(3).

The goal of a revocation sentence is primarily "to sanction the violator for failing to abide by the conditions of the court-ordered supervision," in order to account for the breach of trust inherent in failing to follow the court-imposed conditions of supervised release.  U.S.S.G. Ch. 7, Pt. A(3)(b); *see also United States v. Sindima*, 488 F.3d 81, 86 (2d Cir. 2007).  Nonetheless, "the nature of the conduct leading to the revocation" is appropriately considered "in measuring the extent of the breach of trust."  *See* U.S.S.G. Ch. 7, Pt. A(3)(b); *see also id.* (Under the approach adopted by the Sentencing Commission, "at revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator.").

---

[4] The Government received this call recording, along with the other Rikers Island jail calls, after the defendant's March 18 and April 3, 2024 federal court appearances, and provided a copy of the call to Probation in advance of the May 15, 2024 hearing.  The call was subsequently brought to the attention of the Court and the United States Marshals Service.  (*See* Hr'g Tr. at 2-3.)

Here, because Specification Nos. 1 and 5 are Grade A violations, the offense for which the defendant was convicted in Case No. 21 Cr. 153 (KM) (D.N.J.) is a Class C felony, and the defendant was in criminal history category III when he was sentenced in that case, the applicable Guidelines range for each of Specification Nos. 1 and 5 is 18 to 24 months' imprisonment, and the statutory maximum sentence is 24 months' imprisonment. *See* 18 U.S.C. § 3583(e)(3); U.S.S.G. § 7B1.4(a). Because Specification Nos. 2, 3, and 4 are Grade C violations, the applicable Guidelines range for each of those specifications is 5 to 11 months' imprisonment. *See* U.S.S.G. § 7B1.4(a). The Court may order that a term of imprisonment run consecutively to any sentence imposed in the defendant's pending state case. *See United States v. Rivera-Santiago*, 834 F. App'x 630, 633 (2d Cir. 2020) (affirming revocation sentence that was imposed consecutively to an anticipated but unimposed state sentence); *see also United States v. Johnson*, 827 F.3d 740, 745 (8th Cir. 2016) (cited in *Rivera-Santiago*) (affirming imposition of revocation sentence imposed "consecutively to any state sentence [the defendant] may receive," where the defendant's "state charges of domestic violence, resisting arrest, and misdemeanor assault remained pending"); *United States v. Long*, No. 02 Cr. 30103, 2012 WL 2905304, at *1-2 (C.D. Ill. July 16, 2012) (similar). The Court may also impose a term of supervised release not to exceed three years, less any term of imprisonment that is imposed upon revocation. *See* 18 U.S.C. § 3583(h).

The Government has conferred with Probation, which recommends that the Court impose a sentence of 24 months' imprisonment, to run consecutively to any sentence imposed in the defendant's parallel state case, and to be followed by a one-year term of supervised release, with the previously-imposed special conditions of supervised release reimposed. Probation further recommends that mental health treatment (which Probation advises may include anger management treatment) be included as an additional special condition of supervised release.[5]

V.    **Discussion**

The defendant, after receiving a below-Guidelines sentence and being afforded the opportunity to participate in the RISE Court, violently assaulted J.C., a 17-year-old with autism, simply because the defendant believed that J.C. had thrown a snowball at him. This flagrant breach of the Court's trust, the defendant's history and characteristics—including his impulsive and violent statements and behavior, and apparent lack of remorse—and the need to protect the public from further crimes of the defendant, all call for the within-Guidelines, statutory maximum sentence of 24 months' imprisonment.

*First*, the extremely serious nature and circumstances of the offense underscore the extent of the defendant's breach of the Court's trust. *See* 18 U.S.C. §§ 3583(e)(3), 3553(a)(1). The defendant cut open the face of a vulnerable minor victim, J.C., because the defendant believed (incorrectly, as it turned out) that J.C. had thrown a snowball at him. The large wound that J.C. suffered from the defendant's slashing will unquestionably leave J.C. permanently scarred—not

---

[5] The VOSR and Amended VOSR Report note that Probation recommends a sentence of 12 months' imprisonment (*see* Amended VOSR Report at 4; VOSR Report at 4); however, following the May 15, 2024 violation hearing, Probation advised the Government that it now recommends the sentence described in the text above.

just physically, but mentally as well. Indeed, after slashing J.C., the defendant, in substance, yelled at J.C. to remember the defendant's slashing ("remember mines, nigga"). The defendant also threatened J.C. with a gun ("I keep a ratchet on me, pussy.")—a threat that, while itself extraordinarily serious, is concerning for the additional reason that the defendant, who has two prior felony convictions, is prohibited from possessing any firearm, and any such possession would be both a serious crime and a further breach of the defendant's conditions of supervised release. *See* 18 U.S.C. § 922(g)(1).

*Second*, the defendant's history and characteristics weigh in favor of a significant sentence. *See* 18 U.S.C. §§ 3583(e)(3), 3553(a)(1). While Judge McNulty imposed a below-Guidelines sentence in Case No. 21 Cr. 153 in light of the defendant's youth at the time of a prior robbery and his limited criminal history in later years, the defendant, now 36 years old, has proven that he has not outgrown serious and violent criminal behavior. As reflected on jail calls, the defendant has discussed his violence against women, including kicking a woman, smacking a woman ("like I might smack the bitch you know what I'm saying"), threatening to kill the mother of his children ("you a dead bitch, I don't give a fuck if you tell the police or not"), and threatening his Probation Officer ("I'm gonna violate that bitch"). (*See* Exs. A, B, D.) In discussing such conduct, the defendant demonstrated no remorse or appreciation for the wrongfulness of his actions, but rather justified and/or minimized it (*e.g.*, the defendant "pushed [a woman] with his feet" because "she was talking mad shit, it was annoying [him]"; the defendant did not engage in "domestic violence" because he would smack a woman but was not "beating up bitches"). (*Id.*) The defendant also expressed no appreciation for the seriousness of his underlying wire fraud conduct ("I ain't kill nobody . . . I took money out the bank" (Ex. C)), or the seriousness of the instant violations ("I ate a nigga food. Apparently." (GX 7-3, GX 7-3T)). To the extent the defendant ever expressed regret for his violation conduct, the defendant only did so because he was in jail, rather than out of remorse for the serious harm he inflicted on J.C. (*See* GX 7-2, GX 7-2T, GX 7-4, GX 7-4T.)

*Third*, the need to protect the public from further crimes of the defendant counsels in favor of a significant sentence. *See* 18 U.S.C. §§ 3583(e)(3), 3553(a)(2)(C); *see also United States v. Mccrudden*, 655 F. App'x 23, 24 (2d Cir. 2016) (district court properly considered the defendant's history of threatening behavior, and the need to protect the public from the defendant, when sentencing the defendant for violations of supervised release). As noted above, the defendant has indicated that he intends to violate his conditions of supervised release when released. (*See* Ex. C ("Ya'll niggas goin' to have to just keep on violating me. I'm gonna do whatever I want.").) Indeed, even when the defendant has suggested regret for engaging in the instant violation conduct, he has left open the possibility of future violence. (*See* GX 7-4, 7-4T ("I'm going home, and, *unless I really gotta do something*, . . . I'm just gonna be a pussy nigga . . . . *[U]nless I really gotta do it to a nigga*, I'm just going to be a pussy nigga") (emphasis added).). The defendant's stated willingness to engage in future violence is particularly concerning, in light of his history of violence (including domestic violence) and threats. *See, e.g.*, *Mccrudden*, 655 F. App'x at 24.

Accordingly, the statutory maximum and within-Guidelines sentence of 24 months' imprisonment is sufficient, but not greater than necessary, to serve the purposes of the sentencing law. *See, e.g.*, *United States v. Perko*, 694 F. App'x 25, 28 (2d Cir. 2017) (summary order) (affirming statutory maximum sentence for violation of supervised release, in light of "the seriousness of [the defendant's] conduct"). In addition, the Court should impose such a term of

imprisonment to run consecutively to any future sentence in the defendant's parallel state court case, which remains pending. *See Rivera-Santiago*, 834 F. App'x at 633; *Johnson*, 827 F.3d at 745; *Long*, 2012 WL 2905304, at *1-2.

Finally, the Government agrees with Probation that the Court should impose the maximum term of supervised release to follow any term of imprisonment (*i.e.*, 12 months' supervised release, if the defendant is sentence to 24 months' imprisonment), and reimpose the previously-imposed special conditions of supervised release (*see* Dkt. 37 at 3-4, 21 Cr. 153 (KM) (D.N.J.) (listing such conditions)), with mental health treatment as an additional special condition of supervised release.

### VI.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 24 months' imprisonment, to run consecutively to any state sentence that the defendant may receive in his parallel state court case, and re-impose a term of supervised release with the previously imposed special conditions and a special condition of mental health treatment.[6]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____
Adam Z. Margulies
Samuel S. Adelsberg
Assistant United States Attorneys
(212) 637-2345 / 2494

Cc:    Andrew Dalack, Esq. (by ECF and e-mail)
       U.S. Probation Officer Stephanie Zhang (by e-mail)

---

[6] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).